# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 59588-5-II |
| Respondent, | |
| v. | |
| TREYVONE JAHEIM ISHAQ, | UNPUBLISHED OPINION |
| Appellant. | |

Veljacic, J. — Treyvone Jaheim Ishaq appeals his conviction of two counts of assault in the second degree, one count of drive-by shooting, and one count of unlawful possession of a firearm in the second degree. Ishaq raises three issues on appeal. First, Ishaq argues that the trial court erroneously admitted hearsay evidence, prejudicing the verdict and denying his right to a fair trial. Second, Ishaq alleges that the information names specific victims of the drive-by shooting while the jury instructions did not, so the court incorrectly instructed the jury on the drive-by shooting charge, denying his right to notice and also allowing the jury to convict him on an uncharged theory of the case. Third, Ishaq asserts that his unlawful possession of a firearm conviction should be reversed because it violates the Second Amendment to the United States Constitution. Because the admission of the hearsay evidence was harmless, and Ishaq did not preserve his other arguments for review, we affirm.

FACTS

I.    BACKGROUND

Ishaq was in a relationship with Sandy Doherty. Doherty was friends with Cierra Schaffner, who lived with her mother, Kristen Schaffner, in Puyallup.[1, 2] Early on in Ishaq and Doherty's relationship, they would spend time together at the Schaffners' house. About four or five months into their relationship, things began to deteriorate. Their relationship ended on or around Thanksgiving 2021.

On November 26, the day after Thanksgiving, Ishaq went to the Schaffners' home. Kristen answered the door. Ishaq stated that he wanted to get his stuff back from Doherty. Kristen replied that Doherty did not live at their house. In response, Ishaq stated, "If I don't get my stuff back, I'll be back to shoot up your house." 3 Rep. of Proc. (RP) at 230. Ishaq left shortly thereafter, and Kristen instructed Cierra to call 911 to report the encounter.

On December 11, Kristen had picked up Cierra from work earlier that evening, and at 2:00 a.m., they were out sitting and talking on the porch. It was cloudy and lightly raining. As they were talking, they noticed a gray Dodge, with its headlights off, turn onto their street and drive "really slow . . . in front of the house" and then take off at a "regular speed down the road." 3 RP at 233-34. Twenty minutes later, they observed the same vehicle, coming from the opposite direction, approach their house. The vehicle slowed down and turned off its headlights as it drew closer to the Schaffners' home. Then, "the back-passenger's side window" went down, and an

---

[1] Because Cierra and Kristen share the same last time, we refer to them by their first names when appropriate. No disrespect is intended.

[2] Kristen and Cierra lived with Kristen's mother, brother, niece, and two granddaughters.

individual, later identified as Ishaq,[3] extended his arm out of the window and discharged a firearm two or three times.[4] 3 RP at 234-35. Kristen and Cierra "ducked [after] the shots were fired," and the vehicle took off. 3 RP at 236. Cierra called 911 about one minute afterward, naming Ishaq as the shooter.

Police arrived at the scene later that morning. None of the bullets hit the Schaffners' house; instead, the bullets struck a vehicle that was parked "kitty-corner" of the residence. 3 RP at 274. Kristen and Cierra provided statements to the responding officers.

The police contacted the Schaffner family a couple of months after the incident. At this time, Cierra and Kristen were shown photo montages of potential suspects, and they both identified Ishaq as the shooter.

On January 18, 2022, police located Ishaq at an apartment complex in Lakewood. During this time, Officer Steven Moffitt encountered several of Ishaq's family members, including a woman named Julie Benn, who identified herself as Ishaq's mother. Police proceeded to arrest Ishaq and take him into custody.

The State charged Ishaq with two counts of assault in the first degree, one count of drive-by shooting, and one count of unlawful possession of a firearm in the second degree. The language of the count for drive-by shooting specifically named Kristen and Cierra and is as follows:

> That TREYVONE JAHEIM ISHAQ, in the State of Washington, on or about the 11th day of December, 2021, did unlawfully, feloniously, and recklessly discharge a firearm, thereby creating a substantial risk of death or serious physical injury *to K.L.S. and/or C.G.S., a human being*, and the firearm was discharged from a motor vehicle or from the immediate area of a motor vehicle that was used to

---

[3] Kristen testified that she "could see [Ishaq's] . . . whole side of his face and his shoulder." 3 RP at 235. And Cierra testified that she saw Ishaq's arm and face. Both of them positively identified Ishaq as the shooter again while testifying.

[4] There is conflicting testimony whether two or three shots were discharged.

transport the defendant or the firearm to the scene of the discharge, contrary to RCW 9A.36.045(1), and against the peace and dignity of the State of Washington.

Clerk's Papers (CP) at 12 (emphasis added).

II.    TRIAL

A.    Cell Phone Evidence Connecting Ishaq to the Shooting

The police learned during the investigation that a woman named Benn was Ishaq's mother. Benn conveyed that she was Ishaq's mother to Moffitt. The police also learned, using cell site records, that a cell phone number associated with Ishaq but registered to Benn had been in the general vicinity of the Schaffners' home on December 11, 2021, between 2:16 a.m. and 2:22 a.m., the time frame of the shooting.

Before voir dire began at Ishaq's trial, the court considered defense counsel's motions in limine. None of defense counsel's motions in limine pertained to Benn's identity as Ishaq's mother.

After the jury had been empaneled, the State proceeded with its case, and the issue of Benn's identity came to the forefront. Outside the presence of the jury, the State proposed introducing Benn as Ishaq's mother through Moffitt's testimony. Specifically, Moffitt would recount how, on January 18, 2022, Benn told Moffitt that Ishaq was her son. The State claimed this evidence was admissible under ER 803(a)(19),[5] which provides that evidence among a person's family pertaining to the person's parentage or ancestry may be admissible even if such

---

[5] ER 803(a)(19) allows hearsay statements to be admitted when they are related to "[r]eputation among members of a person's family by blood, adoption, or marriage, or among a person's associates, or in the community, concerning a person's birth, adoption, marriage, divorce, death, legitimacy, relationship by blood, adoption, or marriage, ancestry, or other similar fact of a person's personal or family history."

evidence is hearsay. Defense counsel objected to the admission of this evidence, arguing that this exception to the hearsay rule did not apply. Ultimately, the court admitted the statement.

During the trial, other evidence, apart from Benn's hearsay statement, was introduced that established that Benn is Ishaq's mother. For example, Detective Jeff Martin testified that "based on information obtained from other investigators at Lakewood," he believed that there was a "[m]other/son" relationship between Benn and Ishaq. 3 RP at 292. Martin also explained that he researched applicable "law enforcement databases available" to him and did not "find anything contradictory" regarding Benn and Ishaq's relationship. 3 RP at 292. Defense counsel did not object to any of Martin's testimony.

B. Ishaq's Stipulation to a Prior Felony Adjudication

Before resting its case, the State introduced a stipulation by Ishaq that he was "previously convicted of[,] or adjudicated guilty as a juvenile[,] of a felony offense" for the purposes of the one count of unlawful possession of a firearm in the second degree.[6] 3 RP at 330 After engaging in a colloquy with Ishaq, the court accepted the stipulation, read the stipulation into the record, and the State rested its case. At no point during this discussion, or any other part of trial, did defense counsel argue that Ishaq's previous adjudication did not satisfy RCW 9.41.040. And defense counsel never argued that the unlawful possession of a firearm charge was unconstitutional under the Second Amendment to the United States Constitution, even though the trial occurred almost a year after the Supreme Court announced its decision in *New York State Rifle & Pistol Assoc., Inc. v. Bruen*, 597 U.S. 1, 142 S. Ct. 2111, 213 L. Ed. 2d 387 (2022)—the case on which Ishaq relies in this appeal.

---

[6] Ishaq was previously adjudicated guilty of, among other crimes, residential burglary in violation of RCW 9A.52.025.

C.      Jury Instructions

After Ishaq rested his case, the court proceeded to discuss jury instructions. Instruction 13, the "to convict" instruction for the crime of drive-by shooting, did not reference Kristen and Cierra. Instead, the instruction read as follows:

> To convict the defendant of the crime of drive-by shooting as charged in count 3, each of the following elements of the crime must be proved beyond a reasonable doubt:
> (1) That on or about December 11, 2021, the defendant recklessly discharged a firearm;
> (2) That the discharge *created a substantial risk of death or serious physical injury to another person*;
> (3) That the discharge was either from a motor vehicle or from the immediate area of a motor vehicle that was used to transport the shooter or the firearm to the scene of the discharge; and
> (4) That this act occurred in the State of Washington.
> If you find from the evidence that each of these elements has been proved beyond a reasonable doubt, then it will be your duty to return a verdict of guilty.
> On the other hand, if after weighing all the evidence you have a reasonable doubt as to any one of these elements, then it will be your duty to return a verdict of not guilty.

CP at 139 (emphasis added). Defense counsel did not object to instruction 13 during the colloquy with the court.

D.      Closing Argument

During the State's closing argument, the State explained that the crime of drive-by shooting does not involve "specific people." 4 RP at 378-79. To that end, the State explained,

> So the State suggests that if you believe it happened in the neighborhood that it did, at the time that it did, with two people on that porch and a person who is doing that discharging would reasonably infer at two o'clock in the morning, some of [the] houses around there have got people that are sleeping in them. Okay? That is recklessly creating a substantial risk of death or serious physical injury to another person.

I can go one step further. You have some pictures of at least some of those houses, and they are made out of wood. They are not concrete block, they are not brick. A round can penetrate a window, a round can penetrate a wall. That's a drive-by shooting, if he's the one that pulled the trigger under the circumstances that you have evidence from.

4 RP at 379-80.

### E. Jury's Verdict and Ishaq's Sentence

The jury found Ishaq guilty of two counts of assault in the second degree, one count of drive-by shooting, and one count of unlawful possession of a firearm in the second degree. The jury also returned a special verdict finding that Ishaq was "armed with a firearm at the time of the commission of the crime" regarding his assault in the second degree charges. 5 RP at 423.

The court imposed a sentence of 159 months in confinement, including the firearm enhancements.

Ishaq appeals.

## ANALYSIS

### I. THE COURT'S ADMISSION OF BENN'S STATEMENT WAS HARMLESS

Ishaq argues that the court erroneously admitted Benn's statement that she was Ishaq's mother under ER 803(a)(19), and that decision to admit this evidence deprived him of his right to a fair trial.[7] The State concedes that the admission of Benn's statement was improper but argues

---

[7] Ishaq also appears to argue that the hearsay statement at issue violated his right to confrontation protected by the Sixth Amendment to the United States Constitution. However, he does not support this argument with adequate argument in his opening brief, nor does he elaborate further in his reply brief. Our Supreme Court has made clear that a defendant must object to the admission of hearsay evidence on the grounds of a confrontation clause violation or the claim is not preserved for review. *State v. Burns*, 193 Wn.2d 190, 210-11, 438 P.3d 1183 (2019) (holding that a defendant fails to preserve any confrontation clause argument on appeal if they did not object at trial and any alleged error is not reviewable under RAP 2.5(a)(3)). Ishaq did not preserve this issue for review, so we will not consider it for the first time on appeal.

that the error was harmless. We accept the State's concession and, assuming the admission of Benn's statement was erroneous, conclude that the error was harmless.

Decisions regarding the admissibility of evidence at trial are reviewed for an abuse of discretion. *State v. Thomas*, 150 Wn.2d 821, 856, 83 P.3d 970 (2004). A court abuses its discretion when the court's ruling "'is manifestly unreasonable or based on untenable grounds.'" *State v. Garcia*, 179 Wn.2d 828, 844, 318 P.3d 266 (2014) (internal quotation marks omitted) (quoting *State v. Lamb*, 175 Wn.2d 121, 127, 285 P.3d 27 (2012)). The "[e]rroneous admission of evidence . . . is analyzed under the nonconstitutional harmless error standard." *State v. Gower*, 179 Wn.2d 851, 854, 321 P.3d 1178 (2014). This requires us to determine "whether there is a reasonable probability that, without the error, 'the outcome of the trial would have been materially affected.'" *Id.* (internal quotation marks omitted) (quoting *State v. Smith*, 106 Wn.2d 772, 780, 725 P.2d 951 (1986)).

A criminal defendant has a right to due process under the Fourteenth Amendment to the United States Constitution and article I, section 3 of the Washington State Constitution. U.S. CONST. amend. XIV; WASH. CONST. art. I, § 3. "'[E]rroneous evidentiary rulings can, in combination, rise to the level of a due process violation.'" *Michigan v. Bryant*, 562 U.S. 344, 370 n.13, 131 S. Ct. 1143, 179 L. Ed. 2d 93 (2011) (quoting *Montana v. Egelhoff*, 518 U.S. 37, 53, 116 S. Ct. 2013, 135 L. Ed. 2d 361 (1996) (plurality opinion)).

Here, the statement at issue pertains to Moffitt's testimony recounting Benn affirmatively identifying herself as Ishaq's mother. Evidence of a mother-child relationship was material. This relationship, and the fact that Ishaq resided with Benn, connected Ishaq to a phone that listed Benn's name as the primary account holder. Cell tower records indicated that this phone was in the general vicinity of the crime when it occurred, further supporting that Ishaq was the shooter.

Several other pieces of evidence support that there was no "reasonable probability that, without the error, 'the outcome of the trial would have been materially affected.'" *Gower*, 179 Wn.2d at 854 (internal quotation marks omitted) (quoting *Smith*, 106 Wn.2d at 780).

First, Martin's testimony served as an independent basis for the jury to conclude that Benn was Ishaq's mother.[8] At trial, Martin testified that he believed that there was a "[m]other/son" relationship between Been and Ishaq. 3 RP at 292. Ishaq did not object to this testimony at trial.[9, 10]

Second, even if Martin's testimony was objected to and was ultimately inadmissible, the remaining evidence is such that the outcome would not have been materially affected. Two weeks before the incident, Ishaq, while at the Schaffners' home, threatened, "If I don't get my stuff back, I'll be back to shoot up your house." 3 RP at 230. The Schaffners also testified about being familiar with Ishaq before the incident. To that end, Cierra and Kristen testified that they saw

---

[8] The State acknowledged that it had to prove Benn was Ishaq's mother to connect him to the cell tower records, and it made clear that Martin was going to introduce this information.

[9] Defense counsel's objection specifically took issue with introducing Benn's identity as Ishaq's mother through Moffitt, and there was no mention of Martin's testimony. Martin's testimony was not objected to, and this serves as an independent basis for the jury to conclude Benn was Ishaq's mother.

[10] Collaterally, in Ishaq's reply brief, he argues that defense counsel did not need to object because there was a standing objection from Ishaq's motion in limine regarding Moffitt's testimony. Ishaq appears to assert that his motion applies to Martin's testimony identifying Benn as Ishaq's mother. Notably, none of Ishaq's pretrial motions in limine focused on Benn's parental relationship with Ishaq. And while a party can bring a motion in limine mid-trial, *see* 30 DAVID N. FINLEY & LISA MCGUIRE, WASHINGTON PRACTICE: MOTIONS IN LIMINE § 1:6, at 5 (2024) ("Motions in limine are typically brought at the beginning of trial, but have also been brought during trial when evidentiary issues are anticipated by the parties."), defense counsel raised no argument, nor did they request a standing objection, regarding the inadmissibility of *Martin's* testimony during the colloquy with the court focusing on Benn's mother-child relationship with Ishaq. Therefore, we conclude that this evidence was not objected to, and it could serve as an independent basis for the jury to conclude Benn was Ishaq's mother.

Ishaq's face in the car as he shot at their home. Cierra also identified Ishaq as the shooter immediately after the incident on the 911 call, which was admitted. And both Cierra and Kristen positively identified Ishaq as the shooter in the photo montage and at trial.

Therefore, assuming the court's admission of Benn's statement through Moffitt's testimony pursuant to ER 803(a)(19) was erroneous, any error was harmless because Ishaq was identified as the shooter without reliance on the phone records.

II.     ISHAQ DID NOT PRESERVE REVIEW FOR THE REMAINDER OF HIS ARGUMENTS

Generally, courts do not consider issues raised for the first time on appeal. *State v. McFarland*, 127 Wn.2d 322, 332-33, 899 P.2d 1251 (1995); RAP 2.5(a). An issue, however, may be raised for the first time on appeal if there is (1) a "lack of trial court jurisdiction," (2) a "failure to establish facts upon which relief can be granted," or (3) a "manifest error affecting a constitutional right." RAP 2.5(a); *McFarland*, 127 Wn.2d at 332-33. Critically, RAP 2.5(a)(3) "is not intended to afford criminal defendants a means for obtaining new trials whenever they can 'identify a constitutional issue not litigated below.'" *State v. Scott*, 110 Wn.2d 682, 687, 757 P.2d 492 (1988) (quoting *State v. Valladares*, 31 Wn. App. 63, 76, 639 P.2d 813 (1982), *aff'd in part, rev'd in part*, 99 Wn.2d 663, 664 P.2d 508 (1983)). Instead, the exception "encompasses developing case law while ensuring only certain constitutional questions can be raised for the first time on review." *State v. O'Hara*, 167 Wn.2d 91, 98, 217 P.3d 756 (2009). And even when a defendant satisfies RAP 2.5(a)(3), the error is still subject to review under the constitutional harmless error standard. *Scott*, 110 Wn.2d at 687 (explaining that RAP 2.5(a)(3) "does not help a defendant when the asserted constitutional error is harmless beyond a reasonable doubt").

To satisfy RAP 2.5(a)(3) "and raise an error for the first time on appeal, [a defendant] must" first demonstrate that "the error is truly of constitutional dimension." *O'Hara*, 167 Wn.2d at 98. Then, a defendant must prove that the error was manifest. *Id.* Stated differently, "[t]he defendant must identify a constitutional error and show how the alleged error actually affected the defendant's rights at trial." *State v. Kirkman*, 159 Wn.2d 918, 926-27, 155 P.3d 125 (2007). If a party raising an argument for the first time on appeal fails to satisfy the exception articulated in RAP 2.5(a)(3), the claim of error is not reviewable.

Courts "do not assume the alleged error is of constitutional magnitude;" instead, "[w]e look to the asserted claim and assess whether, if correct, it implicates a constitutional interest as compared to another form of trial error." *O'Hara*, 167 Wn.2d at 98.

"'Manifest' in RAP 2.5(a)(3) requires a showing of actual prejudice." *Kirkman*, 159 Wn.2d at 935. Actual prejudice requires a "'plausible showing by the defendant that the asserted error had practical and identifiable consequences in the trial of the case.'" *Id.* (internal quotation marks omitted) (quoting *State v. WWJ Corp.*, 138 Wn.2d 595, 603, 980 P.2d 1257 (1999)).

A.     The Information and "To Convict" Instruction for Drive-By Shooting

For the first time on appeal, Ishaq asserts that instruction 13, the "to convict" instruction for drive-by shooting, enabled the jury to convict him of creating substantial risk of death or serious physical injury to any other person, whereas the information only charged him with creating a substantial risk of death or serious physical injury to Kristen and Cierra. In a conflation of two distinct concepts, Ishaq argues that his right to notice of the charge against him was violated (because the information did not say "another person"), and that he was convicted of a crime he was not actually charged with. Because Ishaq did not object to instruction 13 at trial, his argument is not preserved for review. We may review an alleged error that is unpreserved if Ishaq

demonstrates that there was a "manifest error affecting a constitutional right." RAP 2.5(a)(3). He does not make this showing.

Alleged errors in jury instructions are reviewed de novo. *State v. Sibert*, 168 Wn.2d 306, 311, 230 P.3d 142 (2010). "An instructional error is presumed to have been prejudicial unless it affirmatively appears that it was harmless." *State v. Smith*, 131 Wn.2d 258, 263, 930 P.2d 917 (1997). "Once an error is presumed to be prejudicial, it is the State's burden to show that it was harmless." *Id.*

A criminal defendant has a right to be notified "of the nature and cause of the accusation of a criminal charge." *In re Pers. Restraint of Brockie*, 178 Wn.2d 532, 536, 309 P.3d 498 (2013); U.S. CONST. amend. VI; WASH. CONST. art. 1, § 22. A charging document only meets constitutional muster if "all essential elements of a crime, statutory and non-statutory, are included in the document so as to apprise the accused of the charges against him or her and to allow the defendant to prepare a defense." *State v. Vangerpen*, 125 Wn.2d 782, 787, 888 P.2d 1177 (1995). To that end, a defendant "cannot be tried for an offense not charged." *State v. Pelkey*, 109 Wn.2d 484, 487, 745 P.2d 854 (1987). Unnecessary language in a charging document, however, may be disregarded, "unless it is repeated in the jury instruction." *State v. Tvedt*, 153 Wn.2d 705, 718, 107 P.3d 728 (2005); *State v. Miller*, 71 Wn.2d 143, 146, 426 P.2d 986 (1967). And an "information [is not] insufficient as a charging document if the defendant is not prejudiced by the inclusion of unnecessary language." *Tvedt*, 153 Wn.2d at 718.

The to convict instruction "must contain all of the elements of the crime because it serves as a 'yardstick' by which the jury measures the evidence to determine guilt or innocence." *Smith*, 131 Wn.2d at 263. Failure to do so constitutes reversible error under basic principles of due

process. *Id.* at 264-66; *State v. Johnson*, 100 Wn.2d 607, 623, 674 P.2d 145 (1983), *overruled on other grounds by State v. Bergeron*, 105 Wn.2d 1, 711 P.2d 1000 (1985).

The crime of drive-by shooting does not require that a specific victim be targeted or injured. *In re Pers. Restraint of Bowman*, 162 Wn.2d 325, 332, 172 P.3d 681 (2007). Rather, the State need only prove a substantial risk that a person might be injured by the defendant's reckless conduct. *Id.*[11]

Because a criminal defendant has a right to notice and the right not to be convicted of a crime that was not charged, Ishaq's alleged error implicates a constitutional right. *Brockie*, 178 Wn.2d at 536; *Pelkey*, 109 Wn.2d at 487. But Ishaq cannot show the alleged error was manifest. This case is similar to *Tvedt*. 153 Wn.2d 705. There, the defendant was charged with several counts of armed robbery in the first degree, and the State, in its information, specifically identified two victims in counts VIII (Younce and Schaefer) and X (Shepherd and Piper). *Id.* at 709, 718-19. Our Supreme Court, in its discussion of the additional named victims, explained that "where unnecessary language is included in an information, the surplus language is not an element of the crime that must be proved *unless it is repeated in the jury instructions*." *Id.* at 718 (emphasis added).

---

[11] RCW 9A.36.045 provides that "[a] person is guilty of drive-by shooting when he or she recklessly discharges a firearm as defined in RCW 9.41.010 in a manner which creates a substantial risk of death or serious physical injury to another person and the discharge is either from a motor vehicle or from the immediate area of a motor vehicle that was used to transport the shooter or the firearm, or both, to the scene of the discharge."

The surplusage was not included in the jury instructions because there were no jury instructions in Tvedt's trial, as the case was tried to a judge. *Id.* at 709. Because the statute for the charge required only that the State prove, among other elements, that "property was taken from the presence of a person," the inclusion of additional unnecessary victims Schaefer and Piper in the respective counts was surplusage. *Id.* at 718-19.

Similarly, here, the crime of drive-by shooting "does not require a specific victim." *See State v. Bell*, 26 Wn. App. 2d 821, 839, 844, 529 P.3d 448 (2023) (explaining that "assault in the first degree requires intent to inflict great bodily harm[, whereas] . . . drive-by shooting requires discharge of a firearm from a motor vehicle"); *Bowman*, 162 Wn.2d at 332 ("Drive-by shooting does not require a victim; [rather,] it requires only that reckless conduct creates a risk that a person might be injured."). And like *Tvedt*, while the Schaffners' names were listed in the information, they were not included in jury instruction 13. 153 Wn.2d at 718. Consequently, the inclusion of the Schaffners in the information was unnecessary surplusage, and the term "another person" within instruction 13 encompassed both of them. *See id*. Moreover, Ishaq was on notice of the charges against him because the State cited to RCW 9A.36.045(1) in the information, and instruction 13 mirrored the elements of the statute for the offense.

Instruction 13 did not enable the jury to convict Ishaq of a crime with which he was not charged, nor did it deprive him of his right to notice. Consequently, Ishaq cannot establish actual prejudice because the alleged error did not have practical and identifiable consequences at trial. There is no manifest error affecting a constitutional right, and we decline to review this alleged error for the first time on appeal.

B.        Ishaq's Felon in Possession Conviction

Ishaq argues that his conviction for unlawful possession of a firearm must be reversed because RCW 9.41.040(2)(i)(A), which prohibits, inter alia, the possession of firearms by persons who have previously been adjudicated of any felony as a juvenile, is unconstitutional as applied to him under the Second Amendment to the United States Constitution.  Because Ishaq did not raise this claim below, it is unpreserved.  As such, we can decline review of this issue unless this alleged error is a "manifest error affecting a constitutional right."  RAP 2.5(a)(3).

Ishaq cannot establish that the issue implicates a constitutional right.[12]  Individuals who have been convicted or adjudicated guilty of a felony offense, *both violent and nonviolent*, do not have a right to possess a firearm under the Second Amendment.  *State v. Ross*, 28 Wn. App. 2d 644, 651, 537 P.3d 1114 (2023), *review denied*, 2 Wn.3d 1026, 544 P.3d 30 (2024); *State v. Bonaparte*, 32 Wn. App. 2d 266, 279, 554 P.3d 1245 (2024), *review denied*, 4 Wn.3d 1019, 566 P.3d 98 (2025); *State v. Olson*, 33 Wn. App. 2d 667, 683, 565 P.3d 128 (2025).[13]

Ishaq has not demonstrated a manifest error affecting a constitutional right, and we therefore decline to review this alleged error for the first time on appeal.

---

[12] Our Supreme Court has previously explained that an individual "being charged, convicted, and sentenced pursuant to an unconstitutional charging statute qualifies as a manifest error affecting a constitutional right."  *State v. Rice*, 174 Wn.2d 884, 893, 279 P.3d 849 (2012).  Because RCW 9.41.040 is constitutional under the Second Amendment, however, Ishaq does not succeed in demonstrating that his claim implicates a constitutional right.

[13] Ishaq cites to several federal circuit decisions to support that individuals previously convicted or adjudicated guilty of a felony offense have a right to possess a firearm under the Second Amendment.  *See* Reply Br. at 13-18 (citing *United State v. Connelly*, 117 F.4th 269 (5th Cir. 2024); *United States v. Diaz*, 116 F.4th 458 (5th Cir. 2024).  Federal circuit precedent is not binding on this court.  *See State v. Pippin*, 200 Wn. App. 826, 837, 403 P.3d 907 (2017) ("[W]e *may* utilize well-reasoned, persuasive authority from federal courts and sister jurisdictions to resolve a question.") (emphasis added).  Because our state authorities are dispositive on the constitutionality of RCW 9.41.040, we will not read the persuasive circuit authority to reject our state authorities on this issue.

CONCLUSION

Accordingly, we affirm Ishaq's conviction.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

_____
Veljacic, J.

We concur:

_____
Glasgow, J.

_____
Cruser, C.J.